IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RSR CORPORATION, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 3:00-CV-0250-P |
| | § | |
| INTERNATIONAL INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Now before the Court are Plaintiffs RSR Corporation, Quemetco, Inc., Quemetco Metals Limited, Inc. f/k/a Murph Metals, Inc., and Quemetco Realty, Inc.'s (collectively "RSR") Motion for Partial Summary Judgment, filed October 22, 2008, and Defendant International Insurance Company's ("International") Motion for Summary Judgment, also filed October 22, 2008. Both parties filed Responses on November 17, 2008 and Replies on December 1, 2008. The parties have settled the West Dallas claim, and now contest only the claim for insurance coverage involving Harbor Island.

After careful consideration of the parties' briefing and the applicable law, the Court DENIES RSR's Motion for Summary Judgment and GRANTS International's Motion for Summary Judgment.

I.   **BACKGROUND**

**A. Summary of the Facts**

In 1981, North River Insurance Company issued four Environmental Impairment Liability insurance policies ("EIL Policies") to RSR and various affiliated entities.[1] Those four EIL Policies provide successive layers of EIL coverage and are designated, respectively, as Policy Nos. JU 3004, JU 3005, JU 3006, and JU 3007.[2] The EIL Policies provide limits of liability totaling $60 million, with a per claim limit of $30 million, subject to the terms and conditions of the EIL Policies.[3] The EIL Policies provide coverage for locations including RSR's lead smelting facility located on Harbor Island, near Seattle, Washington.[4] In 1993, pursuant to an Assumptive Reinsurance Agreement, International succeeded the interests of North River Insurance Company in the EIL Policies.[5]

### 1.  The Environmental Impairment Liability Policies

Insuring Agreement 1 of the EIL Policies provides as follows:

> In consideration of the Premium and subject to the limitations, terms and
> conditions herein expressed, the Insurers agree to indemnify the Insured against
> all sums which the Insured shall be obligated to pay for compensatory but not
> punitive or exemplary damages by reason of the liability imposed upon the
> insured by law on account of: –
> (a) Personal Injury, including death at any time resulting therefrom;
> (b) Property Damage;
> (c) Impairment or diminution of other interference with any other environmental
> right or amenity protected by law;

---

[1] Joint Pretrial Order 27, July 24, 2001 ("Pretrial Order") (Stipulated Fact No. 1).

[2] *Id*. (Stipulated Fact No. 2). Except as to the limit of liability and premium, the terms and conditions of Policy No. JU 3004, including each of the Insuring Agreements, are incorporated by reference into Policy Nos. JU 3005, JU 3006, and JU 3007. RSR's Mot. App. 0169, 0175, 0183 (Endorsement No. 2 to Policy Nos.JU 3005, JU 3006, and JU 3007 ).

[3] Pretrial Order 27 (Stipulated Fact No. 3).

[4] RSR's Mot. App. 0158 (Endorsement No. 2 to Policy No. JU 3004); International's Original Answer ¶ 64, April 3, 2008.

[5] Pretrial Order 28 (Stipulated Fact No. 7).

arising within the Territorial Limits designated in the Declarations and caused by Environmental Impairment in connection with the Business of the Insured at the locations designated in the Declarations and in respect of which a claim has been made against or other due notice has been received by the Insured during the Policy Period.[6]

Condition 8 of the EIL Policies is an "other insurance" clause, which provides:

> This Policy shall not be called upon in contribution and no liability shall attach hereunder for any injury, loss, damage, costs or expenses recoverable under any other insurance insuring to the benefit of the Insured except as regards any excess over and above the amounts collectible under such other insurance; provided always that this clause shall not apply to any policy that is specifically arranged by the Insured to cover limits in excess of those stated in this Policy. Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of any other insurance.[7]

RSR's EIL Policies provide coverage for environmental impairment liability, but specifically exclude, among other things, liability arising from environmental impairment caused by a "sudden and accidental happening"[8] or a "fire or explosion."[9] The EIL Policies define "Environmental Impairment" as:

> (a) the emission, discharge, dispersal, disposal, seepage, release or escape of any liquid, solid, gaseous or thermal irritant, contaminant or pollutant into or upon land, the atmosphere or any watercourse or body of water;
> (b) the generation of smell, noises, vibrations, light, electricity, radiation, changes in temperature or any other sensory phenomena but not fire or explosion arising out of or in the course of the Insured's operations, installations or premises, all as designated in the Declarations.[10]

---

[6]RSR's Mot. App. 0154 (Insuring Agreement 1 to Policy No. JU 3004).

[7]*Id.* at 0156 (Condition 8 to Policy No. JU 3004).

[8]*Id.* at 0155 (Exclusion 8 to Policy No. JU 3004).

[9]*Id.* (Environmental Impairment definition to Policy No. JU 3004).

[10]*Id.*

### 2.  The Comprehensive General Liability Policies

In addition to the EIL Policies, RSR has also maintained Comprehensive General Liability insurance ("CGL Policies"),[11] including primary, excess, and umbrella coverage.[12] Some of RSR's CGL Policies contain an exclusion for environmental claims, but have an exception to that exclusion for sudden and accidental events.[13] Other CGL Policies have an exclusion for environmental claims, but have an exception to that exclusion for hostile fires.[14] Finally, other CGL Policies do not have any exclusions for environmental claims, but cover only "accidents" and "occurrences."[15]

### B.  Procedural History

In 1993, RSR sued approximately 53 of its CGL insurance providers in the matter styled *RSR Corp. v. A.I.U. Insurance Co.*, Cause No. 93-0127, in the 71st District Court for the Judicial District of Harrison County, Texas ("Harrison County Action").[16] Subsequently, in 2001, certain CGL insurers made International a cross-claim defendant and sought contribution from International in the Harrison County Action.[17]

In the Harrison County Action, RSR asserted claims against the CGL insurers for, *inter alia*, failing to comply with their obligations in connection with environmental cleanup costs incurred at,

---

[11]*Id.* at 0149 (Decl. of John A. De Paul).

[12]*Id.*

[13]*Id.* at 0149 (Decl. of John A. De Paul), 0187-1796 (sudden and accidental CGL Policies).

[14]*Id.* at 0149 (Decl. of John A. De Paul), 1797-3851 (hostile fire CGL Policies).

[15]*Id.* at 0149 (Decl. of John A. De Paul), 3852-4576 (accident/occurrence CGL Policies).

[16]*Id.* at 0001 (Decl. of Michael S. Gardner); International's Original Answer ¶ 51, April 3, 2008.

[17]*Id.*

and personal injury lawsuits asserted in connection with, more than 26 environmental sites across the United States, including the Harbor Island site.[18] In addition, RSR asserted claims against the CGL insurers for consequential damages arising from RSR's inability to obtain financing in connection with a proposed acquisition of certain assets of GNB Technologies Inc., based on the CGL insurers' alleged failure to comply with their obligations.[19] As of June 2002, RSR valued the damages attributable to that lost opportunity to be in excess of $140 million.[20] RSR also asserted claims against International for breach of the EIL Policies, for violations of Article 21.21 of the Texas Insurance Code, and for recovery of attorneys' fees.[21]

From 1993 through 2005, each of the CGL insurers that were not dismissed by RSR entered into settlement agreements and/or insurance policy buy-back agreements with RSR ("settlements").[22] In total, RSR entered into 36 separate settlements with its CGL insurers, from which it received an aggregate payment of $76,006,501.[23] On October 27, 2004, RSR dismissed International from the

---

[18]RSR's Mot. App. 0003-0072 (RSR's Tenth Am. Pet. in the Harrison County Action, November 2, 2002); *id.* at 0087 (International's Interrog. Resp. No. 5) ("Plaintiffs' claims in the Harrison County Action related to more than 20 sites . . .").

[19]*Id.* at 0003-0072 (RSR's Tenth Am. Pet. in the Harrison County Action, November 2, 2002).

[20]*Id.*

[21]*Id.*

[22]*Id.* at 0150 (Decl. of John A. De Paul); *id.* at 4661-4746 (settlements); International's Original Answer ¶¶ 52-53, April 3, 2008.

[23]International's Mot. App. 01605 (Decl. of Bryan H. Jones); *id.* at App. 00216-00759 (settlements).

Harrison County Action.[24] Following the execution of the last of the settlements, RSR non-suited the Harrison County Action.[25]

International commenced the present action in February 2000, seeking a judicial declaration that it had no further indemnification obligations to RSR under the EIL Policies in connection with the West Dallas and Harbor Island sites.[26] In October 2000, RSR asserted counterclaims, including claims for declaratory relief and breach of contract.[27]

In August 2001, RSR and International went to trial on the Harbor Island claim to resolve certain coverage issues related to that site. The Court had ruled that the trial would resolve a discrete set of coverage issues, while reserving other unripe coverage and damages issues for future resolution. After the jury rendered its verdict, the Court entered judgment for RSR on the Harbor Island claim, declaring that International

> is contractually obligated to indemnify RSR for any remediation costs and expenses that RSR is or becomes obligated to pay to the United States Environmental Protection Agency ("EPA") with respect to the EPA's remediation activity at the Harbor Island site... to the extent such remediation costs and expenses are covered by EIL Policies JU 3004, 3005, 3006, and 3007... covering the period September 4, 1981 through November 4, 1982, and are not otherwise excluded by the terms of the policies listed above....[28]

---

[24]RSR's Mot. App. at 0073-0076 (Notice of International Non-Suit); *id.* at 0087 (International's Interrog. Resp. No. 5) ("RSR filed the Harrison County Action on April 5, 1993, but did not seek leave to sue International for coverage under its EIL policies until February 22, 2002. RSR then voluntarily non-suited International from the Harrison County Action just before a trial setting in October 2004, and the case continued without [International].").

[25]*Id.* at 0150 (Decl. of John A. De Paul).

[26]*See generally* International's Original Compl., February 2, 2000.

[27]*See* RSR's Second Am. Original Answer and Countercl., October 17, 2000. RSR twice amended its counterclaim. *See* RSR's Second Am. Original Answer and Am. Countercl., November 1, 2000; RSR's Fourth Am. Answer and Second Am. Countercl., May 25, 2001.

[28]Order of October 25, 2001.

The Court also determined that the EPA made a claim against RSR, that RSR did not waive its right to coverage with respect to the Harbor Island site, that RSR's Harbor Island lawsuit against International was not barred by the statute of limitations, and that RSR take nothing from its common-law bad faith and Texas Insurance Code claims against International.[29] The Fifth Circuit affirmed the Court's judgment on September 19, 2005.[30]

In March 2006, RSR moved to reopen this case and for further relief under 28 U.S.C. § 2202, seeking indemnification from International up to the amount of the remaining policy limits for cleanup, defense, and settlement costs incurred in connection with the West Dallas site, as well as recovery of attorneys' fees.[31] Also in March 2006, International requested leave to amend its Complaint to add new coverage and damages defenses that were not ripe at the time of trial in 2001.[32]

In February 2007, the Court issued an order granting RSR's motion to reopen the case and for further relief, and granting International's motion for leave to allow International to amend its complaint.[33] The Court stated that International would only be allowed to amend its complaint to add "defenses/exclusions" that could not have been raised in the August 2001 trial, or that "were expressly reserved for future resolution."[34] Specifically, with respect to the Harbor Island claims, the

---

[29]*Id.*

[30]*Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 286-89 (5th Cir. 2005).

[31]*See* RSR's Mot. to Reopen, March 7, 2006.

[32]*See* International's Mot. for Leave to File Fourth Am. Compl., March 30, 2006.

[33]*See* Mem. Opinion and Order of February 8, 2007.

[34]*Id.*

Court permitted International to raise issues with respect to Exclusion 12 regarding pre-existing contamination, Exclusion 8, the Condition 8 defense, and Interpretation 1 regarding the allocation between covered and non-covered costs and expenses. International was precluded, however, from asserting defenses based on the purported non-existence of coverage under Insuring Agreements 1 and 3. The Court further precluded International from arguing that "to the extent there is no coverage under Insuring Agreements 1 or 3 for the Harbor Island settlement, coverage may be limited or nonexistent under Insuring Agreement 4."[35]

In March 2007, International filed its Fourth Amended Complaint.[36] International asserted five claims for declaratory relief with respect to coverage as to the Harbor Island site: (i) Exclusion 8 precludes coverage; (ii) Exclusion 12 regarding pre-existing contamination precludes coverage; (iii) Interpretation 1 precludes coverage; (iv) Condition 8 precludes coverage; and (v) to the extent that RSR is entitled to coverage, International is entitled to credits and/or offsets for certain payments that RSR has received from other insurers.[37]

On March 7, 2008, RSR filed its Original Complaint, asserting claims for declaratory relief, breach of contract, and recovery of attorneys' fees in connection with the West Dallas and Harbor Island sites.[38] RSR sought relief in connection with its claims for coverage under the EIL Policies for the "Harbor Island EPA Action," in which RSR agreed, pursuant to a Consent Decree entered by the Court on March 20, 2006, to reimburse the United States $8.5 million for environmental

---

[35]*See id.* at 3-8.

[36]*See* International's Fourth Am. Compl., March 23, 2007.

[37]*See id*. at 11-12.

[38]*See* RSR's Original Compl., March 7, 2008.

cleanup costs incurred at the Harbor Island site, and for the "Equilon Action," in which Equilon Enterprises LLC d/b/a Shell Oil Products US, the owner of a facility adjacent to RSR's at the Harbor Island site, sued RSR for contribution of its environmental cleanup costs.[39]

International answered RSR's Original Complaint on April 3, 2008.[40] In addition to reiterating its claims for declaratory relief, previously set forth in its Fourth Amended Complaint, International also asserted additional affirmative defenses against RSR's claims for coverage under the EIL Policies.[41] International pled: (i) that RSR must reimburse International pursuant to the Loan Agreement and Receipt and/or the Supplemental Agreement for recoveries from its other insurance carriers;[42] (ii) that the EIL Policies required RSR to obtain International's consent to incur the defense costs for which it seeks reimbursement from International under the EIL Policies;[43] (iii) RSR's claims are barred by the doctrines of waiver, estoppel, laches, the law of the case, and the applicable statute of limitations;[44] and (vi) that particular conditions to coverage under the EIL Policies bar RSR's claims for coverage thereunder.[45]

On October 22, 2008, both parties filed Motions for Summary Judgment, now before the Court. In its Motion for Summary Judgment, International claims that: (i) RSR has received

---

[39]*See id.*

[40]*See* International's Original Answer, April 3, 2008.

[41]*Id.* at ¶¶ 78-99.

[42]*Id.* at ¶ 84.

[43]*Id.* at ¶ 86.

[44]*Id.* at ¶ 88-90.

[45]*Id.* at ¶ 93.

settlement proceeds from its CGL insurance carriers that apply to, and exceed the amount of, those liabilities for which RSR seeks insurance coverage from International under the parties' EIL policies, entitling International to a settlement credit that eliminates or reduces its indemnification and/or reimbursement obligation to RSR; (ii) RSR is required to identify the amount of those liabilities for which it seeks indemnification and/or reimbursement from International that are covered by the EIL Policies, but is unable to do so; (iii) RSR was required to, but did not, obtain International's written consent to incur those defense costs for which RSR seeks indemnification and/or reimbursement from International under the EIL Policies; and (iv) RSR's declaratory judgment and breach of contract claims are redundant, requiring the dismissal of the declaratory judgment claim.

RSR, in its Motion for Summary Judgment, argues that International is not entitled to any settlement credit because the settlements are not "other insurance" subject to Condition 8 of the EIL Policies, the CGL Policies do not constitute "other insurance" within the meaning of Condition 8 because the CGL Policies covered different risks than the EIL Policies, and International's rights to a credit or offset are governed by the EIL Policies, not common law. RSR also claims that the law of the case bars International from asserting defenses not specifically permitted by the Court, including: (i) the application of the Loan Agreement and Receipt and/or the Supplemental Agreement; (ii) the requirement to obtain International's consent to incur defense costs; (iii) the doctrines of waiver, estoppel, laches, and/or law of the case; (iv) the expiration of the statutes of limitations; (v) the noncompliance with Insuring Agreement 2 of the EIL Policies; (vi) Exclusions 4, 7(a), 9, 10, and 11 of the EIL Policies; and (vii) Condition 3 of the EIL Policies. RSR further declares that no genuine issue of material fact exists regarding International's asserted defenses.

## II.   **LEGAL STANDARD**

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears the burden of informing the court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such an absence. *Id.* However, all evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). At this point, the nonmovant must provide specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent a summary judgment. *Id.* at 248-50; *Abbot v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir. 1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (*en banc*). Further, the court has no duty to search the record for triable issues. *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998). "The party opposing

summary judgment is required to identify specific evidence in the record and to articulate the precise matter in which the evidence supports his or her claim." *Id.*

## III.   __DISCUSSION__

The parties primarily dispute whether International is entitled to a credit or offset of its liability for the settlement funds received by RSR from its CGL insurers in the Harrison County Action. The Texas Supreme Court has not yet addressed whether non-settling EIL insurers are entitled to a settlement credit as a result of the settlements of CGL insurers. *See Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005) ("In this diversity case the district court and this court must apply the substantive insurance law of Texas."). "The court must therefore make an *Erie*-guess as to how the Texas Supreme Court would decide the question." *Nutmeg Ins. Co. v. Pro-Line Corp.*, 836 F.Supp. 385, 388 (N.D. Tex. 1993). "While decisions of intermediate state appellate courts provide guidance, they are not controlling. If a state's highest court has not ruled on the issue in question, a federal court must determine, to the best of its ability, what the highest court of the state would decide." *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565-66 (5th Cir. 2005) (citations omitted).

### A.   Credit or Offset Pursuant to Condition 8

Under Texas law, the relationship between an insurer and the insured is contractual, and therefore governed by the parties' agreement. *Henson v. S. Farm Bureau Cas. Ins. Co.*, 17 S.W.3d 652, 653 (Tex. 2000). The interpretation of an insurance contract is generally a question of law for the court, *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999), with the goal being "to give effect to the written expression of the parties' intent" by reading all parts of

the contract together and striving to give meaning to all parts of the agreement." *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 740-41 (Tex. 1998). Therefore, the Court begins its analysis with the disputed Condition 8 of the EIL Policies.

Insuring Agreement 1 of the EIL Policies requires International to indemnify RSR for its environmental remediation and defense costs attributable to *covered* liabilities at the Harbor Island site. *See Int'l Ins. Co.*, 426 F.3d at 288-89. Condition 8 of the EIL Policies provides that "no liability shall attach hereunder for any injury, loss, damage, costs or expenses recoverable under any other insurance insuring to the benefit of the Insured except as regards any excess over and above the amounts collectible under such other insurance...." International claims that Condition 8 establishes its right to a credit for the settlements collected by RSR from other insurance carriers. RSR argues that Condition 8 does not apply to the settlements because they do not constitute "other insurance" under Condition 8, and because the CGL Policies covered different risks than the EIL Policies.

## 1. Settlements Constitute "Other Insurance" Under Condition 8 of the EIL Policies

RSR first argues that, based on its plain language, Condition 8 does not apply to settlements.[46] The Court disagrees. Condition 8 states that "no liability shall attach hereunder for any... costs or expenses recoverable under any other insurance insuring to the benefit of the Insured except as regards any excess over and above the amounts collectible under such other insurance...." Insurance settlements are, by their very nature, payments to foreclose an insurer's potential liability

---

[46]RSR's Mot. for Summ. J. 24.

under a policy's coverage.[47] Amounts *actually collected* in settlement of claims under other insurance policies are patently at least some part of the total "amounts collectible under such other insurance" under Condition 8.

RSR also asks the Court to adopt the position of *E.R. Squibb & Sons, Inc. v. Accident & Casualty Insurance Co.*, where the Southern District of New York stated that "settlement agreements are not contracts of insurance." *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, No. 82 Civ. 7327(JSM), 1997 WL 251548, at *1 (S.D.N.Y. May 13, 1997), *aff'd*, 241 F.3d 154 (2d Cir. 2001). There, the court sought to determine how, applying a *pro rata* allocation method, it should account for an insured's settlements with some insurers when determining the liability of non-settling insurers. *Id*. The settling insurers had agreed to pay a specified amount, which the settlement agreements allocated to certain underlying claims for settlement purposes. *Id*. The non-settling insurers argued that they should be credited with the settlement amounts according to the allocation method employed in the settlement agreements. This approach served the non-settling insurers' interests because the settlement agreements' allocations, in some instances, amounted to more than a settling insurer's actual share of the overall liability. *Id*. The non-settling insurers grounded their arguments in their contract of insurance, which provided that "[u]nderwriters shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance." *Id*.

In that context, the court held that "[t]his language is of no help to the insurers because the settlement agreements are not contracts of insurance." The court reasoned that if the settlement

---

[47] *See* International's Mot. App. at 0321 (Continental Casualty Company Settlement Agreement) ("The parties expressly agree that this Agreement terminates and resolves any obligation of [Continental Casualty Company] under all of the policies for or in connection with any claims for Environmental Damage arising out of, involving or relating to the Sites.").

agreements allocated amounts to a period of liability, "for which an insurer was not actually liable under its contract under the legal principles established in this case, the allocation in the settlement agreement does not reflect the [settling] insurer's legal obligation under its contract." *Id.* (citing *Maryland Cas. Co. v. W.R. Grace & Co.*, 1996 WL 109068, at *12 (S.D.N.Y. March 12, 1996)). The *Squibb* court then credited the non-settling insurers with the amounts that it found were "valid and collectible," those amounts "that the law applicable to those policies, including the triggers of coverage which have been established in this case, would obligate those insurers to pay." *Id*.

RSR takes the statements of the *Squibb* court out of context to support its claim that Condition 8 does not reduce International's liability in the present case. RSR argues that under the *Squibb* reasoning, International may not receive any settlement credits. But in *Squibb*, the non-settling insurers were, in fact, receiving credits for settlement payments. The settlement payments were allocated under the settlement agreement, and the court merely refused to apply those allocations when determining the credits of a third party, non-settling insurer. *Id*.

## 2. RSR is Judicially Estopped from Arguing that the EIL and CGL Policies Cover Different Risks Based on Temporal Differences

Under Texas law, the "provisions of an 'other insurance' clause apply only when the 'other' insurance covers the same property and interest therein against the same risk in favor of the same party." *Hartford Cas. Ins. Co. v. Executive Risk Specialty Ins. Co.,* 2004 WL 2404382, at *2 (Tex.App.—Dallas Oct. 28 2004, pet. denied). Here, the CGL Policies provide coverage for damages resulting from "sudden and accidental" emissions and "hostile fires."[48] The EIL Policies, by contrast,

---

[48]RSR's Mot. App. 0187-3851 (CGL Policies).

do not provide coverage for "sudden and accidental happening[s]"[49] or for environmental impairment resulting from a "fire or explosion."[50]

RSR claims that because the EIL Policies cover different risks than those covered by the CGL policies, Condition 8 has no application to the CGL Policies.[51] RSR characterizes the EIL Policies as covering "routine" environmental impairment, which it describes "the converse" of "sudden and accidental" emissions.[52] Courts have generally determined that under Texas law "routine" pollution occurs "in the usual course of business" at "repeated, regular" intervals over a lengthy period of time. *See Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 195 (5th Cir. 1998); *SnyderGeneral Corp. v. Great Am. Ins. Co.,* 928 F.Supp. 674, 680-81 (N.D.Tex.1996). The Fifth Circuit has held that

> under Texas law, the [sudden and accidental] clause contains a temporal element in addition to the requirement of being unforeseen or unexpected. The 'sudden and accidental' requirement unambiguously excludes coverage for all pollution that is not released quickly as well as unexpectedly and unintentionally.

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 554 (5th Cir. 2004).  Relying in part on these distinctions between "routine" and "sudden and accidental" pollution, RSR urges the Court that the EIL Policies covered different risks than the CGL Policies.[53]

---

[49]*Id.* at 0155 (Exclusion 8 to Policy No. JU 3004.)

[50]*Id.* (Environmental Impairment definition to Policy No. JU 3004.)

[51]RSR's Mot. for Summ. J. 26-27.

[52]*Id*. at 28-29.

[53]*Id*. at 30.

International argues that RSR is judicially estopped from arguing that the EIL and CGL Policies cover different risks.[54] Judicial estoppel is an equitable doctrine that "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 347 (5th Cir. 2008) (quoting *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003)). The purpose of the doctrine is to "protect [ ] the essential integrity of the judicial process" by reducing the "risk of inconsistent court determinations." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (internal quotations omitted). The Fifth Circuit has recognized at least two requirements to invoke the doctrine: (1) the party's position must be clearly inconsistent with its previous one, and (2) the previous court must have accepted the party's earlier position. *See Hall*, 327 F.3d at 396 (applying federal law of judicial estoppel where state substantive law applied to claims).

Here, RSR's arguments are directly contrary to the position that it took in the Harrison County Action against its CGL insurers—a position that was adopted by the state court in 2003. There, RSR advocated for the court to rely on regulatory estoppel and hold that the "sudden and accidental" exception to the pollution exclusion in the CGL Policies allowed for coverage of "all forms of emissions causing pollution liabilities, except for those resulting from intentional pollution."[55] RSR specifically objected to the CGL insurers' assertion that "sudden and accidental" applied only to pollution that was "temporally sudden."[56] The state court agreed with RSR, and held

---

[54]*Id*. at 31-34.

[55]International's App. 1904 (RSR's Harrison County Action Resp. to Mot. for Summ. J.)

[56]RSR's Resp. 14.

that the "sudden and accidental" exception in the CGL Policies functions to "provide coverage for all unexpected and unintended pollution."[57] The state court declined to impose any temporal requirement, such as a requirement of quickness or abruptness, on the "sudden and accidental" exclusion.[58] Therefore, judicial estoppel bars RSR from taking the position that the EIL Policies cover different risks than the CGL policies based on their temporal limitations or lack thereof.

In its pleadings, RSR claims that the "vast majority" of the cleanup and defense costs incurred by RSR relating to the Harbor Island site and the Equilon Action were attributable to "routine (*i.e.*, covered), as opposed to sudden and accidental (*i.e.*, non-covered), emissions of lead."[59] Pollution resulting from routine emissions may nonetheless be "unexpected and unintended pollution." *See Primrose Operating Co.*, 382 F.3d at 554 (holding that the day-to-day, non-negligent operation of an oil facility may result in unexpected and unintentional water contamination). The ruling by the court in the Harrison County Action construed the scope of the coverage of the CGL Policies to encompass unexpected and unintended, but possibly routine, emissions. Regardless, neither party has argued that the pollution at Harbor Island was expected or intentional. Thus, any abstract coverage differences—"routine" as versus "unexpected and unintended"—are immaterial here.

### 3. RSR has Admitted that the EIL and CGL Policies both Cover the Harbor Island Claims

---

[57] International's App. 1876 (Harrison County Action Letter Order of March 19, 2003.)

[58] *Id.*

[59] RSR's Original Compl. 14; RSR's Resp. 6.

As discussed above, "other insurance" clauses apply under Texas law only when the coverages at issue "generally cover the same property and interest therein against the same risk in favor of the same party." *Nutmeg Ins. Co. v. Employers Ins. Co. of Wausau*, 2006 WL 453235, at *12 (N.D.Tex. Feb. 24, 2006) (quoting *State Farm Fire & Cas. v. Griffin*, 888 S.W.2d 150, 155 (Tex.App.—Hous. [1st Dist.] 1994)). Although, on their faces, the EIL and CGL Policies do not provide identical coverage on all potential claims, their coverage need not be completely coextensive for them to be considered "other insurance" as to each other. *Id.* (citing *Am. Cent. Ins. Co. v. Harrison*, 205 S.W.2d 417, 420 (Tex.Civ.App.—Eastland 1947, writ ref'd n.r.e.)); *see also Viacom Int'l, Inc. v. Admiral Ins. Co.*, 2006 WL 1060504, at *23 (N.J. Super. A.D. April 21, 2006) ("an EIL and a CGL policy covering environmental contamination can nevertheless cover the same subject matter... the same interest... and the same risk...").

RSR has previously claimed that the risks at issue in this instance—the Harbor Island claims—are covered by both the EIL and CGL policies. And RSR does not point to any differences in coverage that would impact the relevant issues now before the Court. Therefore, regardless of whether the risks covered by the EIL and CGL policies are entirely co-extensive or not, the policies appear to be co-extensive in the material respects relevant in this case. Thus, the CGL Policies constitute "other insurance" for purposes of Condition 8.

RSR has previously maintained that the damages at issue in the present case were covered by its CGL Policies. Here, RSR seeks damages in connection with the Harbor Island site, claiming that International must reimburse RSR for payments it made toward environmental cleanup costs in

the Harbor Island EPA Action and the Equilon Action.[60] Yet RSR also made claims against its CGL insurance carriers in the Harrison County Action for environmental liabilities arising from the Harbor Island site. RSR's petition in the Harrison County Action reflects that RSR's claims against its other insurers included the Harbor Island site.[61]

Further, RSR's corporate representative, John De Paul, has acknowledged that the claims against the CGL carriers were the same as the claims against the EIL carriers, and that RSR was seeking coverage from both for the defense and indemnity costs associated with the Harbor Island site.[62] De Paul, who negotiated the purchase of the EIL Policies for RSR, stated in his deposition in the Harrison County Action that RSR believed that the policies from International and its other insurance carriers covered the same risks:

> Q:  Well, was it your understanding that with respect to claims by the EPA
>     for cleanup of sites associated with smelters that both the CGL coverage
>     and the EIL coverage would apply to those risks completely?
>
> A:  Yes.
>
> Q:  They would overlap completely for that coverage?
>
> A:  Well, say completely. You know, I don't know about completely, but almost.[63]

In addition to De Paul's testimony, the allocation models created by RSR's expert witness in the Harrison County Action also reflected the fact that RSR was not discounting its claims against the non-EIL insurers based upon any "sudden and accidental" distinction, but was instead

---

[60]*See* RSR's Original Compl., March 7, 2008.

[61]International's Mot. App. 0155-0157 (RSR's Tenth Am. Pet. in the Harrison County Action 9-11, November 2, 2002).

[62]*Id.* at 01731-01733, 01832-01833 (De Paul depo. at 71-73).

[63]International's Resp. App. 01934 (De Paul depo. at 10-17).

allocating the full amount of its claims to those policies.[64] RSR's expert Richard White based his allocation models upon the full amount of RSR's estimated past and future liabilities and, on a site by site basis, assigned those liabilities to individual policies.[65] White did not allocate any Harbor Island liabilities to the EIL Policies, but instead assigned all the liabilities to the CGL Policies.[66]

In effect, RSR has on multiple occasions admitted that the damages at issue in the present case would be covered by the CGL Policies. Based on RSR's prior assertions, both the CGL and EIL Policies provide coverage for the environmental damages at Harbor Island that RSR asserts in this case. Hence, they are "other insurance" with respect to each other, at least for the present claims, regardless of any additional or different coverages that the policies may provide. *See Nutmeg Ins. Co.*, 2006 WL 453235, at *12. Therefore, under Condition 8, RSR may only recover from International "any excess over and above the amounts collectible" under its CGL Policies.

### B. Credit or Offset Pursuant to the Common Law One-Satisfaction Rule

Although the contractual provisions control, International would alternatively be entitled to settlement credits under Texas common law. The parties do not dispute that Texas adheres to the "one-satisfaction" rule, which provides that "a plaintiff should not be compensated twice for the same injury." *CTTI Priesmeyer, Inc. v. K&O Ltd. P'ship*, 164 S.W.3d 675, 683 (Tex. App.—Austin 2005, no pet.) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)). The one-satisfaction rule prevents a plaintiff from recovering more than the amount of its loss from multiple

---

[64]*Id*. at 02054 (White Allocation Model).

[65]*Id*.

[66]*Id*. at 02049-50 (White depo. at 141-42).

defendants, and "may require a trial court to reduce a damage recovery based on a settlement." *Galle, Inc. v. Pool*, 262 S.W.3d 564, 573 (Tex. App.—Austin 2008, pet. filed). The principle of one-satisfaction is imposed by statute on tort claims in Texas, but arises under common law in the context of certain contract claims. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.002(a) and 33.012(b); *Galle*, 262 S.W.3d at 573 (one-satisfaction rule applies in contract cases where overlapping categories of damages are sought as to multiple defendants); *CTTI Priesmeyer, Inc.*, 164 S.W.3d at 684 (one-satisfaction rule applies to contract claims where the same contractual promises were made by multiple defendants).

International argues that Condition 8 would not preclude the application of the common law one-satisfaction rule. International further claims that the one-satisfaction rule, consistent with the recent decision in *Galle, Inc. v. Pool*, requires that it be given a credit for the amount of settlement proceeds that RSR received from the CGL insurers for the environmental liabilities and damages for which RSR now seeks reimbursement from International.[67] RSR counters that the inclusion of an "other insurance" provision in a contract controls whether a settlement credit is available. RSR also argues that International is not entitled to a settlement credit under the one-satisfaction rule, according the holding in *CTTI Priesmeyer, Inc. v. K&O Ltd. Partnership*, because it is not jointly and severally liable with the CGL insurers for the liabilities incurred by RSR.[68]

### 1. Condition 8 Does Not Preclude Awarding Settlement Credit under Texas Common Law

---

[67]International's Mot. for Summ. J. 24.

[68]RSR's Resp. 12.

Contractual provisions, such as the "other insurance" clause of Condition 8, control the availability of a settlement credit. *See RLI Ins. Co. v. Phila. Indem. Ins. Co.,* 421 F.Supp.2d 956, 966 (N.D. Tex. 2006) (holding that under Texas law, insurers must rely on the terms of their contracts). But even if Condition 8 did not apply here, under Texas common law RSR would still not be entitled to a recovery in this case. Texas courts have established that the one-satisfaction rule may be applied to contract claims. *Osborne v. Jaregui*, 252 S.W.3d 70, 75 (Tex. App.—Austin, 2008, no pet.). In fact, Texas courts appear to use the one-satisfaction rule as a gap-filler in contract cases to prevent a double recovery in cases where there is no contractual provision preventing double recovery. *See, e.g.*, *Galle*, 262 S.W.3d at 573; *Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 70-71 (Tex.App.—Texarkana 2004, pet. filed); *Oyster Creek Fin. Corp. v. Richwood Inv. II, Inc.*, 176 S.W.3d 307, 326-27 (Tex.App.—Houston [1st Dist.] Aug. 12, 2004, pet. denied); *Buccaneer Homes of Ala., Inc. v. Pelis*, 43 S.W.3d 586, 590 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Thus, Condition 8 would not negate the application of the one-satisfaction rule.

## 2. The One-Satisfaction Rule Applies under *Galle* and *Osborne*

Although the Texas Supreme Court has not stated its position on settlement credits or the applicability of the one-satisfaction rule to contract claims, in *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.* the court clearly expressed its general policy with regard to a plaintiff receiving a "double recovery" in the insurance context:

> [W]here there are several policies of insurance on the same risk and the insured has recovered the full amount of its loss from one or more, but not all, of the insurance carriers, the insured has no further rights against the insurers who have not contributed to its recovery. Similarly, the liability of the remaining insurers to the insured ceases, even if they have done nothing to indemnify or defend the insured.

*Mid-Continent Ins. Co. v. Liberty Mutual Ins. Co.*, 236 S.W.3d 765, 775 (Tex. 2007) (quoting

*Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 77 Cal. Rptr .2d 296, 305 (Cal. Ct. App. 1998)).

Even prior to the *Mid-Continent* opinion, the Texas courts of appeals have implemented this

general policy through the application of the one-satisfaction rule to contract claims. In an illustrative

series of cases, the Austin Court of Appeals has recognized an increasingly broad applicability of

the one-satisfaction rule to contract cases.

The Austin Court of Appeals held in *CTTI Priesmeyer, Inc. v. K&O Ltd. Partnership* that

settlement credits are available under the one-satisfaction rule in contract cases only if the parties

were jointly and severally liable for the damages. *CTTI Priesmeyer, Inc. v. K&O Ltd. P'ship*, 164

S.W.3d 675, 684-85 (Tex. App.—Austin 2005, no pet.) (citing *Crown Life Ins. Co. v. Casteel*, 22

S.W.3d 378, 391-91 (Tex. 2000)). The court noted that other Texas intermediate courts had, in

applying the one-satisfaction rule in contract cases, "focused on the indivisible nature of the injury

to the plaintiffs, and have not discussed the requirement of joint liability." *Id.* at 685. The court

specifically rejected that approach, and concluded that because parties to a contract can only be

"jointly or severally liable for breaches of contracts to which they are a party or that promise the

same performance," a non-settling defendant was not entitled to credits for the settlements paid by

other defendants who were not parties to the contract or who had made different promises than the

non-settling defendant. *Id.* The court noted that while the other defendants also had contracts with

the plaintiff, none of them made the same contractual promise. *Id.* Thus, the settling defendants did

not promise the same performance as the non-settling defendant, who therefore could not benefit

from a settlement credit.

In an *en banc* decision in *Osborne v. Jauregui*, the Austin Court of Appeals addressed the one-satisfaction rule in the context of an insurer's subrogation rights. After the discovery of mold in his recently built home, Osborne brought both tort and breach of warranty claims against the builder and numerous subcontractors. *Osborne v. Jauregui*, 252 S.W.3d 70, 73 (Tex. App.—Austin 2008, pet. denied). The insurer fully covered the Osborne's damages, and the subcontractors settled with Osborne. The court held that, under the one-satisfaction rule, the insurer was entitled to subrogation of the settlement funds because the settlement was paid by defendants against whom the plaintiffs had asserted the same damages that were covered by the insurer. *Id.* at 79-80. Although the legal and factual circumstances of *Osborne* are distinct from those of the present case, the court's description of the state of the one-satisfaction rule is helpful:

> [T]he one-satisfaction rule... is "the longstanding proposition that a plaintiff should not be compensated twice for the same injury." The rule guards against a plaintiff receiving a windfall "by recovering an amount in court that covers the plaintiff's entire damages, but to which a settling defendant has already partially contributed. The plaintiff would otherwise be recovering an amount greater than the trier of fact has determined would fully compensate for the injury." The one-satisfaction rule applies both when several defendants commit the same act and when multiple defendants commit "technically different acts" that result in the same, single injury. The application of the rule is not limited to tort claims, and whether the rule may be applied depends not on the cause of action asserted but rather the injury sustained. Thus, if the plaintiff has suffered only one injury, even if based on "overlapping and varied theories of liability," the plaintiff may only recover once; "[t]his is especially true if the evidence supporting each cause of action is the same."

*Id.* at 75 (internal citations omitted).

In the most recent case, *Galle, Inc. v. Pool*, the Pools sued their insurance company and a remediation company, Galle, for negligence and breach of contract related to mold remediation. *Galle, Inc. v. Pool*, 262 S.W.3d 564, 566-68 (Tex. App.—Austin 2008, pet. filed). The Pools settled their claims against the insurer, and the insurer obtained a broad release of "any and all liability now

accrued, or hereafter to accrue" in connection with the mold remediation. *Id.* at 569. The Pools proceeded to trial against Galle alone. The jury held that Galle had made negligent misrepresentations and had breached its contract, and awarded damages. *Id.* at 570. The court found that the settlement release was broad enough to encompass the damages caused jointly by the insurer and Galle. *Id.* at 572-73. Relying on the *Osborne* decision, the court held that Galle was entitled to a settlement credit under the one-satisfaction rule because the damages sought by the plaintiff against Galle overlapped with the damages the Pools had sought against the insurer. *Id.* at 574. The court noted in particular that the damages sought against both Galle and the insurer were based on pleadings and evidence of a common harm or injury. *Id.* (citing *Osborne*, 252 S.W.3d at 73, 76-78).

Both the *Galle* court and the *CTTI* court required a finding of joint liability before implementing a settlement credit in contract cases involving the one-satisfaction rule. However, the *Galle* court applied the *Osborne* standard—"if the plaintiff has suffered only one injury, even if based on overlapping and varied theories of liability, the plaintiff may only recover once"— rather than the narrower standard enumerated in *CTTI Priesmeyer*, in which settlement credits apply in contract cases only where multiple defendants were parties to a contract or promised the same performance. *See Galle*, 262 S.W.3d at 573 (quoting *Osborne*, 252 S.W.3d at 75 and *Buccaneer Homes of Ala., Inc. v. Pelis*, 43 S.W.3d 586, 590 (Tex. App.—Houston [1st Dist.] 2001, no pet.)); *CTTI Priesmeyer*, 164 S.W.3d at 684-85. Like the *Galle* court, numerous other intermediate Texas courts have focused on "the indivisible nature of the injury to the plaintiffs" in one-satisfaction cases involving contract claims. *See Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 70-71 (Tex.App.—Texarkana 2004, pet. filed); *Oyster Creek Fin. Corp. v. Richwood Inv. II, Inc.*, 176 S.W.3d 307, 326-27 (Tex.App.—Houston [1st Dist.] Aug. 12, 2004, pet. denied); *Buccaneer Homes*

*of Ala., Inc.*, 43 S.W.3d at 590. By contrast, no other intermediate Texas courts have taken the approach of *CTTI Priesmeyer*. Thus, the Court will apply the standard of *Osborne* and *Galle.*

### 3. RSR has Suffered Only One Injury

Under the *Osborne* and *Galle* standard, the Court must determine whether RSR has suffered only one injury, for which it seeks overlapping damages from different defendants. *See Galle*, 262 S.W.3d at 573-74. RSR seeks damages in connection with the Harbor Island site, claiming that International must reimburse RSR, under the EIL Policies, for payments it made toward environmental cleanup costs in the Harbor Island EPA Action and the Equilon Action.[69]

As discussed above, RSR made claims against its other insurance carriers in the Harrison County Action for environmental liabilities arising from multiple sites, including Harbor Island. *See* Section III.A.3., *supra*. RSR's petition in the Harrison County Action reflects that RSR's claims against its other insurers included the Harbor Island site.[70] And RSR's corporate representative, John De Paul, acknowledged in his deposition that the claims against the other carriers were the same as the claims against the EIL carriers, and that RSR was seeking coverage from both for the defense and indemnity costs associated with the Harbor Island site.[71] RSR also stated in its discovery responses that its claims against the other carriers in the Harrison County Action were for failure to

---

[69]*See* RSR's Original Compl., March 7, 2008.

[70]International's Mot. App. 0155-0157 (RSR's Tenth Am. Pet. in the Harrison County Action 9-11, November 2, 2002).

[71]*Id*. at 01731-01733, 01832-01833 (De Paul depo.).

provide them with coverage for environmental cleanup costs at 26 environmental sites across the United States, including the Harbor Island site.[72]

RSR does not dispute that the releases of the other insurers encompassed Harbor Island liabilities.[73] RSR gave broad, general releases to its other insurance carriers, as exemplified by the release language in RSR's $4.5 million settlement with Gibraltar:

> RSR and Insurer hereby fully and irrevocably release, acquit, and discharge, each other of and from any and all Claims, whether actual Or alleged, known or unknown, accrued or unaccrued. existing or potential, suspected or unsuspected, which each may have or assert, or may hereafter have or assert., against the other, by reason of any contract (express, oral, or written, implied in fact or implied in law), right to defense, contribution, or indemnification statutory or common law), defect (latent or patent), lien (mechanic's or otherwise), representation or misrepresentation, negligence, statutory or common law bad faith...[74]

De Paul, as RSR's corporate representative, acknowledged that RSR's settlement agreements with its other carriers released them from all liabilities, including Harbor Island:

> Q:  It's certainly true with respect to all of these settlement agreements, they would have in fact released those insurance companies from any liabilities regarding the West Dallas or Harbor Island sites, right?
>
> A:  Yes.[75]

Further, RSR stated in interrogatory answers that "the Settlements resolved RSR's claims related to all known and unknown environmental liabilities, including, but not limited to, the Harrison County

---

[72]*Id*. at 01196-01197 (RSR's Answers to International's Third Set of Interrogs. 3-4); RSR's Original Compl., March 7, 2008.

[73]*Id*. at 01833 (De Paul depo.).

[74]*Id*. at 0747-0748 (Gibraltar Settlement Agreement 6-7).

[75]*Id*. at 01741, 01719-01720, 01735, 01749, 01832-01833 (De Paul depo.).

Action against the other Insurers, who were RSR's comprehensive general liability, excess, and umbrella insurers."[76]

RSR argues, however, that the settlements did not resolve claims for damages for the same injury as asserted in the present action.[77] RSR attempts to base this argument on the fact that the settlements cover numerous different sites across the United States, whereas the present claim against International in connection with the EIL Policies concerns only the Harbor Island site. RSR also states that the claims against the CGL insurers in the Harrison County Action sought to recover for a lost business opportunity worth $140 million, claims not asserted against International. Further, RSR emphasizes that the CGL insurers and International covered different risks and liabilities incurred by RSR. RSR fails, however, to present any evidence to disprove the fact that—despite other differences—both the settlements and the present case attempt to recover damages for the environmental liabilities associated with the Harbor Island site.

The Court concludes as a matter of law that "based on the pleadings and evidence of a common harm or injury," the damages secured by RSR in the settlements with its other insurers overlap with those sought against International. *See Galle*, 262 S.W.3d at 574.

### 4. Texas Law Applies a Dollar-for-Dollar Credit

Courts around the country have implemented various methods of calculating the amount of a credit for settlements from other insurers. *See GenCorp, Inc. v. AIU Ins. Co.*, 197 F. Supp. 2d 995, 1007-08 (N.D. Ohio 2008) (credit equivalent to the policy limits of all of the settled policies); *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1452 (3d Cir. 1996) (credit equivalent to the

---

[76] *Id.* at 01196-01197 (RSR's Answers to International's Third Set of Interrogs. 3-4).

[77] RSR's Resp. 20.

pro rata shares of each of the settled insurance policies). In Texas, applying the one-satisfaction rule to tort claims, the defendant seeking a settlement credit may elect to seek a dollar-for-dollar settlement credit. *Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002). It appears that the dollar-for-dollar, or *pro tanto*, credit method would also be applicable in contract cases. *See Galle*, 262 S.W.3d at 574; *CTTI Priesmeyer*, 164 S.W.3d at 685 n. 3.

### C. International's Burden of Proof on Entitlement to Settlement Credits

Both parties claim that the other party bears the burden of proving or disproving International's entitlement to a settlement credit. There are, in fact, two possible approaches to shifting the burden of proof with respect to settlement credits: the approach taken by the Texas Supreme Court in tort cases, and the approach taken by the Washington Supreme Court in cases involving environmental contamination claims and multiple insurers.

### 1. Texas' Tort Approach

In cases applying the one-satisfaction rule to tort claims, the Texas Supreme Court has established that the defendant has the initial burden of placing evidence of settlement amounts into the record, and then the burden shifts to the plaintiff to show what amounts are allocable to separate rather than joint damages. *See Utts*, 81 S.W.3d at 828; *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex. 2000); *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998). In both *Galle* and *CTTI Priesmeye*r, the Austin Court of Appeals endorsed this burden shifting standard for applying the one-satisfaction rule to contract claims. *Galle*, 262 S.W.3d at 574; *CTTI Priesmeyer*, 164 S.W.3d at 685 n. 3. Applying this approach, the *Galle* court determined that it was the plaintiffs' burden to show that the settlement funds were allocated to the separate damages caused solely by the settling insurer, the plaintiffs failed to satisfy that burden, the full amount of the settlement would

therefore be credited to the plaintiffs' damages under both the tort and breach of contract claims, and the plaintiffs were not entitled to recover because the credit amount exceeded their damages. *Id.* at 572-74.

RSR argues that placing the burden on RSR in the present case would have the effect of contradicting Texas' stated public policy favoring settlement.[78] *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 9 (Tex. 1991) ("This court seeks to promote a public policy that encourages settlements."). International points out, however, that the Texas Supreme Court has assiduously enforced the one-satisfaction rule in the tort context, despite its articulated public policy of encouraging settlements.[79] *E.g., Utts*, 81 S.W.3d at 829; *Casteel*, 22 S.W.3d at 390; *Ellender*, 968 S.W.2d at 927-29; *El Paso Nat. Gas v. Berryman*, 858 S.W.2d 362, 364 (Tex. 1993); *Sterling*, 822 S.W.2d at 5-8. Indeed, in *Ellender*, the Supreme Court imposed the burden to allocate settlement proceeds on the settling party because requiring a non-settling party to prove the settlement's allocation before receiving a settlement credit "not only unfairly penalizes the nonsettling party but also allows settling parties to abrogate the one satisfaction rule" merely by "refusing to allocate." *Ellender*, 968 S.W.2d at 927-28.

## 2. Washington's Insurance Coverage Approach

RSR advocates for the Court to adopt the position that the non-settling, defendant insurer has the burden to prove its entitlement to a settlement credit.[80] This approach was followed by the Washington Supreme Court and "implicitly endorsed by the Second Circuit in *Squibb*." *United Tech.*

---

[78]RSR's Resp. 15.

[79]International's Reply 10.

[80]RSR's Resp 17.

*Corp. v. Am. Home Assurance Co.*, 237 F.Supp.2d 168, 173 (D. Conn. 2001). In *Weyerhaeuser Co. v. Commercial Union Insurance Co.*, the Washington Supreme Court addressed insurance coverage for costs associated with hazardous waste cleanup. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115 (Wash. 2000). As in the present case, all but one of the insurance company defendants settled with the insured, Weyerhaeuser, and the non-settling insurer sought to credit settlement funds received by the insured from the other insurance carriers to reduce its own liability. *Id.* at 125. The Washington Supreme Court concluded that the non-settling insurer bore the burden of demonstrating a double recovery. *Id.* at 127. The court noted that "[a]s the insurers paid Weyerhaeuser for a release from an unquantifiable basket of risks and considerations, we cannot say the settlements simply constituted payment for Weyerhaeuser's cleanup costs." *Id.* at 126. The court declined to impose the burden for proving that it had not received a double recovery on the insured, because "such a rule would encourage litigation and reward the non-settling insurer for refusing to settle." *Id.* After concluding that the non-settling insurer bore the burden of establishing a double recovery, the Washington Supreme Court upheld the trial court's determination that the insurer had not carried that burden, because the "trial court's finding that Weyerhaeuser has not been made whole [was] supported by substantial evidence." The insured had submitted evidence demonstrating that its past cleanup costs greatly exceeded the settlement amounts received from its other insurers, which the insurer had failed to rebut. The court accordingly concluded that the trial court had properly denied the non-settling insurer's request to "offset" settlements received from other insurers. *Id.*

The United States District Court for the District of Connecticut found the *Weyerhaeuser* reasoning persuasive and followed the precedent of the Washington Supreme Court in *United Technologies Corp. v. American Home Assurance Co.* The Connecticut court concluded that "based

on the rationale articulated in *Weyerhaeuser,* and implicitly endorsed by the Second Circuit in *Squibb,*" the non-settling insurer appropriately bears the burden of establishing the existence of a double recovery. *United Tech. Corp.*, 237 F.Supp.2d at 173. The Second Circuit appeared to indicate agreement with this approach in its affirmance of *Squibb*, in which the district court had concluded that "[c]onsiderations of public policy suggest that, if there is to be a windfall, it should be to [the insured] and not the non-settling insurers. Public policy favors encouraging settlements of litigation." *See E.R. Squibb & Sons, Inc. v. Lloyd's & Co.*, 241 F.3d 154, 173 (2d Cir. 2001), *aff'g E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 1997 WL 251548 at *2. In its opinion affirming *Squibb*, the Second Circuit observed that while the insured may have gained from the settlements, "it undoubtedly took the risk that the size of the settlements would be inadequate to cover the settling insurers' pro rata share." *E.R. Squibb & Sons, Inc.*, 241 F.3d at 173.

### 3. Under Either Approach, International is Entitled to Settlement Credits as a Matter of Law

Under either approach, International has met its burden. Thus, the Court need not make an *Erie*-prediction of which approach the Texas Supreme Court will adopt. Regardless of whether the Texas or Washington method ultimately controls, International is entitled to a dollar-for-dollar credit for the settlements.

### a. Under the Texas Approach, RSR has Not Attributed Settlements to Liabilities Other than Harbor Island

By introducing RSR's settlements with the CGL insurers into evidence, International has demonstrated that the settlements totaled more than $76 million.[81] Thus, International has met its burden of placing the settlement amounts in the record. Accordingly, RSR next bears the burden of

---

[81] International's Mot. 13; International's Mot. App. 216-77.

proving that any amounts received from settling insurers have been allocated to liabilities other than Harbor Island.

RSR declares that it has not and cannot allocate the settlement proceeds to specific sites.[82] RSR's Original Complaint asserts that the settlement releases covered "myriad liabilities, and the unquantifiable risk associated therewith," and states that the settlements "did not allocate these payments to particular liabilities or environmental sites, including the... Harbor Island site..."[83] Likewise, RSR states in its interrogatory answers that "the sums it has received from other settling insurance companies in the Harrison County Action... are not required to be, and have not been, allocated to specific liabilities, losses or damages by RSR."[84]

De Paul testified that the settlement agreements released the other insurance carriers from all liabilities, including Harbor Island.[85] Consistent with RSR's Complaint, De Paul testified that RSR's various liabilities were "unquantifiable."[86] De Paul further claimed that he could not identify the source of the payment to the EPA regarding Harbor Island, although he stated that the money used to make the payment came from income to RSR that included the settlements from the other insurers in the Harrison County Action.[87] When he was shown RSR's settlement agreement with Gibraltar, De Paul testified that RSR had not attempted to allocate the $4.5 million in settlement

---

[82]RSR's Resp. 21.

[83]RSR's Original Compl. 54.

[84]*See* International's Mot. App. 00840 (RSR's Answer No.6, Answers to International's First Set of Interrogs.).

[85]*Id*. at 01719, 01720, 01735, 01741, 01832-01833 (De Paul depo.).

[86]*Id*. at 01776 (De Paul depo.).

[87]*Id*. at 01821 (De Paul depo.).

funds, and could not say how that money would be allocated to individual sites or liabilities.[88] When

shown RSR's $23 million settlement agreement with CGL insurers Employers Reinsurance and

Westport, De Paul again testified that RSR had not attempted to allocate those funds to specific sites

or liabilities and he could not say how those funds should be allocated among the various sites and

liabilities.[89]

RSR's conclusory statement that "[the settlements] paid to RSR were for an amount which

is less than the sums needed by RSR for the numerous known and unknown, past and future,

liabilities at 26 different environmental sites and for the consequential damages sustained by RSR

by virtue of the CGL Insurers' bad faith denial of RSR's claims for many years" is wholly

unsupported. RSR points out that it asserted claims against the CGL insurers in the Harrison County

Action for a lost business opportunity of $140 million, claims that were not asserted against

International.[90] However, RSR provides no evidence to support the claimed loss. RSR advances only

its pleadings from the Harrison County Action[91] and the deposition of a consequential damages

expert from the Harrison County Action who failed to place a value on the loss sustained.[92] RSR also

makes the vague claim that RSR is responsible for unknown future liabilities, including a site in

Newark, New Jersey.[93] With regard to the Newark site, De Paul testified that he guesses that future

liabilities arising from that site could "[approach] a billion dollars, a little less." Despite such a

---

[88]*Id.* at 01766 (De Paul depo.).

[89]*Id.* at 01768 (De Paul depo.).

[90]RSR's Resp. 20.

[91]*Id.* at 21-23; RSR's Mot. App. 003-072 (RSR's Tenth Amended Pet. in the Harrison County Action, Nov. 2, 2002).

[92]RSR's Resp. App. 129-217 (Rausser depo., Feb. 27, 2002); 219-339 (Rausser depo., June 20, 2002).

[93]RSR's Resp. 24 n. 78; RSR's Resp. App. 08 (De Paul depo.).

dramatic claim of liability, RSR provides no additional information or documentation regarding the Newark site or its potential liability. Without any evidence, these claims of "unknown past and future liabilities" are inadequate to create a fact issue on summary judgment.

RSR has refused and failed to provide any evidence to allocate its settlement proceeds to specific liabilities other than Harbor Island. In Texas cases, where the settling party does not present an allocation, the non-settling party is entitled to a full credit. *See e.g., Ellender*, 968 S.W.2d at 928; *Galle*, 262 S.W.3d at 573, 574. As a matter of law RSR has not satisfied its burden of showing that the settlements with the CGL insurers were allocated to damages and liabilities other than Harbor Island. Thus, under the Texas tort approach, International is entitled to a dollar-for-dollar credit for the amounts of all the settlements.

### b. Under the Washington Approach, International Satisfies its Burden of Showing a Double Recovery by RSR

Even applying the Washington approach that places the heavy burden of establishing double recovery on International, International still meets that burden and establishes its entitlement to settlement credits. International identifies 25 of RSR's settlements with the CGL insurers that total $76,006,501.[94] International identifies an additional two settlements from 1993 that total $2,675,000, undisputed by RSR.[95] Based on these settlements, which add up to a recovery by RSR of $78,681,501, International demonstrates that RSR's settlement proceeds exceed its aggregate past and future liabilities.

---

[94]International's Mot. 13-14; International's Mot. App. 216-77.

[95]International's Mot. 14; International's Mot. App. 0765-67; 01650-66.

International presents the expert accounting testimony of Bryan H. Jones as to the total remediation costs paid by RSR prior to 2006.[96] Upon analyzing RSR's accounting records, Jones concludes that RSR paid environmental remediation costs totaling $23,953,000 from January 1, 2001 through December 31, 2006.[97] By relying on RSR's expert reports in the Harrison County Action, Jones also determined that RSR paid environmental remediation costs totaling $11,134,000 prior to 2001.[98] Lastly, Jones notes that as of December 31, 2006, RSR management determined that RSR's probable and estimable future environmental remediation liability totaled $23,000,000.[99]

Thus, RSR's recovery can be summarized:

+ 76,006,501 - RSR's settlement proceeds through 2006

+   2,675,000 - Additional 1993 settlements received by RSR

- 23,953,000 - Remediation costs paid by RSR 2001-2006

- 11,134,000 - Remediation costs paid by RSR prior to 2001

-  23,000,000 - RSR's 2006 GAAP estimate of future liabilities

+ 20,594,501 - RSR's net gain

RSR disputes Jones' findings regarding future liabilities based on his reliance on RSR's financial statements and the estimates of future liability appearing therein.[100] The estimated future liabilities that appear in RSR's financial statements are recorded in accordance with generally accepted accounting principles in the United States ("GAAP").[101] Under GAAP, RSR must report

---

[96]International's Mot. 15-16.

[97]International's Mot. App. 01605 (Decl. of Bryan H. Jones, ¶ 11).

[98]International's Supp. Report of Bryan H. Jones 17; International's Resp. App. 02053-58 (White allocation model).

[99]*Id.* at 5.

[100]RSR's Resp. 24; RSR's Resp. App. 341-343 (Decl. of Stuart H. Harden).

[101]*Id.*

an environmental liability where the liability is probable and estimable.[102] RSR agrees that the numbers in RSR's financial statements represent the best estimates of future liabilities by RSR's management, but urges the Court that these numbers should not be relied upon.[103]

RSR's accounting expert Stuart H. Harden claims that only the low end of the range of potential liabilities is recorded in accordance with GAAP, that potential liabilities may not be recorded where management believes that an insurance recovery is probable,[104] and that no liability is recorded where a reasonable potential loss amount cannot be determined.[105] Harden refers to the Newark, New Jersey site as an example of potential future liability that has not been included in financial statements due to uncertainty.[106] Harden also objects to Jones' calculations on the grounds that estimates of future liabilities contained in financial statements may differ from the actual, ultimate loss,[107] and because accountants and auditors generally "interpret 'probable' as 'likely,' a very high threshold."[108] Further, Harden points out that, as RSR's financial statements regularly note,

> ...it is reasonably possible that [RSR's] loss estimates for environmental-related claims will change in the near term. The ultimate loss to be incurred is dependent upon several factors, including the level of participation for other responsible parties, the actual cost to perform the cleanup and the amount of recovery from insurance carriers.[109]

---

[102] International's Mot. App. 780 (RSR's 2003 Financial Statements), 1604 (Decl. of Bryan H. Jones).

[103] RSR's Resp. App. 341 (Decl. of Stuart H. Harden).

[104] *Id*. at 27 (Harden Report 3).

[105] *Id*. at 341.

[106] *Id*. at 342.

[107] *Id*. at 26

[108] *Id*. at 29.

[109] *Id*. at 26

In 2001 RSR's GAAP estimate of future environmental liability was $41,252,000, in 2002 it was $39,493,000, in 2003 it was $26,817,000, and in 2006 it was $23,000,000.[110] The Court notes that each year the estimate of future liability shrank; this trend appears consistent with the concept that each year some estimated future liabilities may be realized. Additionally, over the more than 30 years since RSR's insurance policies were first triggered due to environmental damages, the injuries potentially covered by those policies have manifested themselves, claims have been made and evaluated, and undergone litigation and settlement. Thus, over the many years that environmental damages have been asserted against RSR, the potential future claims against it have become less uncertain. The Court therefore finds that the record does not support RSR's claims that RSR management may have significantly underestimated or under-reported future liabilities, or that massive, unknown future liabilities continue to lurk on the horizon.

Nonetheless, RSR's net settlements and liabilities may alternatively be evaluated by relying on the numbers presented by RSR's own expert in the Harrison County Action, rather than the numbers in RSR's financial statements—thus disposing of the issue of alleged ambiguity in the GAAP compliant financial statements. In the Harrison County Action, RSR presented the expert report of Richard Lane White, which provides his 2005 estimates of total past and future costs for environmental liability broken down by site.[111] The White report lists total past costs, based on indemnity and defense costs, and then adds future estimated indemnity costs to reach the figure for total past and future costs from RSR's 24 sites of environmental liability.[112]

---

[110]*Id.* at 27; International's Mot. App. 1605 (Decl. of Bryan H. Jones).

[111]International's Resp. App. 02054 (White allocation model).

[112]*Id.*

Utilizing White's estimates, RSR's recovery can be summarized:

+ 76,006,501 - RSR's settlement proceeds through 2006

+   2,675,000 - Additional 1993 settlements received by RSR

-   76,643,483 - White's calculation of total past and future liability

    2,038,018 -  RSR's net gains

Under the Washington approach, International has also met its burden of establishing a double recovery by RSR. RSR has not presented evidence to rebut the calculations showing a double recovery. Because RSR's total settlement proceeds exceed its aggregate liabilities, and the settlement proceeds exceed RSR's claims for indemnity and defense costs for the Harbor Island site,[113] the Court grants summary judgment in favor of International.

### D.  Other Affirmative Defenses Raised by International

In addition to claiming settlement credit, International has raised the defenses explicitly allowed by this Court's February 8, 2007 Memorandum Opinion and Order, as well as a number of additional defenses. Because the Court has determined that International is entitled to summary judgment based on RSR's inability to allocate the settlements to any specific damages other than those incurred at the Harbor Island site, the Court declines to address International's remaining defenses and RSR's associated objections.

## IV.   <u>CONCLUSION</u>

For the reasons discussed above, the Court DENIES RSR's Motion for Summary Judgment and GRANTS International's Motion for Summary Judgment.

---

[113] The EIL Policies provide limits of liability totaling $60 million, with a per claim limit of $30 million. Joint Pretrial Order, filed July 24, 2001 (Stipulated Fact No. 3).

**It is so ORDERED.**

Signed, this 23rd day of March, 2009.


_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE